**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PEDRO GONZALEZ, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-09445 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| THE TORONTO-DOMINION BANK, BHARAT B. MASRANI, KELVIN VI LUAN TRAN, RIAZ E. AHMED, and LEOVIGILDO SALOM, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Pedro Gonzalez ("Gonzalez" or "Plaintiff"), by and through his counsel, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by The Toronto-Dominion Bank ("TD" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of TD conferences with investors and analysts; (iii) press releases and media reports issued and disseminated by the Company; (iv) analyst reports concerning TD; and (v) other public information and data regarding the Company.

<u>**NATURE OF THE ACTION AND OVERVIEW**</u>

1.      This is a class action on behalf of all persons and entities who purchased or acquired TD securities between March 7, 2022, and October 9, 2024 (the "Class Period"). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) TD; (ii) the Company's Chief Executive Officer ("CEO") Bharat B. Masrani ("Masrani"); (iii) the Company's Chief Financial

Officer ("CFO") Kelvin Vi Luan Tran ("Tran"); (iv) the Company's former CFO and current Group Head, Wholesale Banking Riaz E. Ahmed ("Ahmed"); and (v) TD's Group Head, U.S. Retail and CEO of TD subsidiary TD Bank, N.A. Leovigildo Salom ("Salom").

2.    TD is a Canadian multinational banking and financial services corporation. Its largest subsidiary, TD Bank, N.A., is a federally chartered national bank in the United States.

3.    This case concerns Defendants' misrepresentations regarding TD's Bank Secrecy Act ("BSA") and anti-money laundering ("AML") controls, processes, and procedures. Throughout the Class Period, Defendants assured investors that the Company was "committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so," and repeatedly touted its "Risk Governance Structure" through which TD's Audit Committee purportedly "[o]versaw the execution and ongoing effectiveness of" the Company's AML controls to ensure that money laundering is "appropriately identified and mitigated." And in 2023, when investors started to learn that TD's regulators were investigating the adequacy of the Company's AML controls, Defendants repeatedly minimized and downplayed the extent of the problems.

4.    In truth, from January 2014 to October 2023, "pervasive" and "systemic deficiencies" plagued TD's AML controls. Despite these "known" and "glaring deficiencies," TD "chose profits over compliance" and "failed to appropriately fund and staff its AML program, opting to postpone and cancel necessary AML projects" to keep its costs down because "senior executives" required that TD's annual budget not increase. As a result, from January 2018 to April 2024, TD failed to monitor the vast majority of its total transactions which allowed criminals to launder hundreds of millions of dollars using the Company's banking products and services.

5.      The truth began to emerge on May 2, 2024 when *The Wall Street Journal* reported that a U.S. Department of Justice ("DOJ") investigation into the Company's AML controls focused on "how Chinese crime groups and drug traffickers" used TD to launder money from the sale of fentanyl in the United States and that "[t]he investigation was launched after agents uncovered an operation . . . that laundered hundreds of millions of dollars in proceeds . . . through TD."  The report also revealed that on May 2, 2024, Canadian regulators fined TD $6.7 million for failing to file required suspicious activity reports related to money laundering.

6.      On this news, the price of TD stock declined $3.42 per share, or 5.9%, from $58.08 per share on May 2, 2024, to $54.66 per share on May 3, 2024.

7.      Five months later, after the close of trading on October 9, 2024, *The Wall Street Journal* reported that TD would plead guilty to criminal charges that it failed to build proper AML systems, that the Company faced $3 billion in penalties for its misconduct, and that the Office of the Comptroller of the Currency ("OCC") was expected to impose an asset cap on TD that would bar the Company from growing above a certain level in the U.S.

8.      The next day, October 10, 2024, TD published a press release disclosing that it had entered into consent orders with the OCC, the Federal Reserve Board, and the Financial Crimes Enforcement Network, and entered into plea agreements with DOJ related to its inadequate AML controls. TD further revealed that under the terms of the consent orders and plea agreements the Company would, among other requirements, pay $3.09 billion in fines and penalties, and that the OCC had imposed an asset cap on the Company's U.S. banking subsidiaries.  In the press release, Defendant Masrani stated, "[w]e have taken full responsibility for the failures of our U.S. AML program and are making the investments, changes and enhancements required to deliver on our commitments."

9.      Also on October 10, 2024, DOJ and the OCC published press releases announcing their respective actions against TD.  According to Attorney General Merrick B. Garland, "TD Bank chose profits over compliance with the law" and that "[b]y making its services convenient for criminals, TD Bank became one."   DOJ explained that from January 2014 to October 2023, TD "had long-term, pervasive, and systemic deficiencies in its U.S. AML policies… but failed to take appropriate remedial action" because "senior executives at TD Bank enforced a budget mandate, referred to internally as a 'flat cost paradigm,' requiring that TD Bank's budget not increase year-over-year."  DOJ also stated that "[o]ver the last decade," federal regulators and the Company's own internal audit group "repeatedly identified concerns about its transaction monitoring program," yet "from 2014 through 2022" the "transaction monitoring program remained effectively static."  As a result, DOJ stated that from January 1, 2018, to April 12, 2024, TD "intentionally did not automatically monitor all domestic automated clearinghouse (ACH) transactions, most check activity, and numerous other transaction types, resulting in 92% of total transaction volume [roughly $18.3 trillion of transaction activity] going unmonitored," allowing criminals to launder hundreds of millions of dollars.

10.     In the OCC's press release, Acting Comptroller of the Currency Michael J. Hsu said, "TD Bank's persistent prioritization of growth over controls allowed its employees to break the law and facilitate the laundering of hundreds of millions of dollars."  Further, the OCC stated TD "had a systemic breakdown in its processes to identify and report suspicious activity, and a pattern or practice of noncompliance with the suspicious activity report filing requirement" and "violated currency transaction reporting requirements on numerous occasions."

11.     On this news, the price of TD stock declined $4.07 per share, or 6.4%, from $63.51 per share on October 9, 2024, to $59.44 per share on October 10, 2024.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendants conducted substantial economic activity in the District.  In addition, TD stock trades on the New York Stock Exchange ("NYSE"), which is situated in this District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff is Pedro Gonzalez.  Plaintiff purchased TD securities during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

17.    Defendant TD is a Canadian corporation with its principal executive offices located at Toronto-Dominion Centre, Toronto, Ontario M5K 1A2.  TD's stock trades on the NYSE under the ticker symbol "TD."

18.    Defendant Masrani is, and was at all relevant times, TD's CEO.

19.    Defendant Tran is TD's CFO, Previously, Tran served as CFO of T.D. Bank, N.A.

20.    Defendant Ahmed is, and was at all relevant times, TD's Group Head, Wholesale Banking.  Previously, from January 2016 to September 2021, Ahmed served as TD's CFO.

21.    Defendant Salom is, and was at all relevant times, TD's Group Head, U.S. Retail and the CEO of TD Bank, N.A.

22.    Defendants Masrani, Tran, Ahmed, and Salom are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with TD, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

23.    The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    TD is the sixth largest bank in North America, serving more than 27.5 million customers.  It's subsidiary, T.D. Bank, N.A., is the tenth largest bank in the United States, providing banking products and services such as checking and savings accounts, debit cards, and loans to over 10 million individual and commercial customers through more than 1,100 bank

branches in the Northeast, Mid-Atlantic, Washington D.C., the Carolinas, and Florida. TD Bank N.A. markets itself as "America's Most Convenient Bank."

**Materially False and Misleading Statements Issued During the Class Period**

25.     Throughout the Class Period, the Company posted a "TD Bank Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions" (the "Statement") on its website. In the Statement, TD asserted that it "is committed to detecting and deterring persons engaged in money laundering or terrorist financing from using TD products or services." Further, TD represented that "[t]his commitment is formalized through the establishment of an enterprise-wide Anti-Money Laundering / Anti-Terrorist Financing (AML/ATF) and Sanctions risk and compliance management program (Global AML Program) that is designed to detect and report suspected money laundering and terrorist financing." TD additionally claimed in the Statement that it ensured "[o]ngoing monitoring to detect and report suspicious transactions or activities" and conducted "independent testing … of control effectiveness."

26.     TD also maintained a Code of Conduct and Ethics (the "Code") on its website throughout the Class Period. Defendants touted, reproduced, and re-filed the Code with the SEC throughout the Class Period, including in Forms 40-F TD filed on December 1, 2022, and November 30, 2023, as well as Forms 6-K TD filed on March 7, 2022, February 14, 2023, March 14, 2023, February 6, 2024, and March 12, 2024. The Code stated:

> TD is committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so. Making the proceeds of criminal activity appear as if they came from legitimate sources is a criminal offence, as is knowingly failing to report transactions or activities where it is suspected they relate to money laundering. . . .We must not knowingly initiate or be party to money laundering and must promptly report suspected money laundering situations in accordance with the Toronto-Dominion Bank Enterprise Anti-Money Laundering and Anti-Terrorist Financing Policy and the escalation procedures established for our business or region.

27.     On March 7, 2022, TD filed its 2022 investor proxy on Form 6-K with the SEC.  In the proxy statement, TD discussed its Audit Committee's efforts to ensure compliance with AML regulations.  Specifically, TD asserted that the Audit Committee, "[r]eceived updates from the internal audit, finance, compliance and global anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions" and "[o]versaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program), including the related risk assessment."

28.     On December 1, 2022, TD filed its Form 40-F Annual Report for fiscal year 2022 with the SEC.  In the 40-F, TD touted its processes for managing risk, including its "Risk Governance Structure," stating that "The Audit Committee oversees . . . the adequacy and effectiveness of internal controls, including internal controls over financial reporting, and the activities of . . . the Anti-Money Laundering/Terrorist Financing/Economic Sanctions/Anti-Bribery and Anti-Corruption Program" which "is responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risk are appropriately identified and mitigated."

29.     TD next filed its 2023 investor proxy on Form 6-K with the SEC On March 14, 2023.  In the proxy statement, TD again touted its Audit Committee's efforts to ensure compliance with AML regulations.  Specifically, TD asserted that the Audit Committee, "[r]eceived updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself

that there are adequate resources with experience and knowledge in each of the key oversight functions" and "[o]versaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program), including the related risk assessment."

30.     Then, on May 8, 2023, *The Wall Street Journal* reported that TD's regulators were concerned about "the way TD handled unusual transactions in recent years, and the speed at which some of the were brought to the attention of U.S. authorities." Still, Defendants continued to tout TD's AML controls and downplayed the issues with the Company's AML controls during Company conference calls with investors and analysts.

31.     On November 30, 2023, TD filed its Form 40-F Annual Report for fiscal year 2023 with the SEC. In the 40-F, TD continued to discuss its processes for managing risk, including its "Risk Governance Structure," stating that "The Audit Committee oversees . . . the adequacy and effectiveness of internal controls, including internal controls over financial reporting, and the activities of . . . Anti-Money Laundering/Terrorist Financing/Economic Sanctions/Anti-Bribery and Anti-Corruption" which "is responsible for the oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risk are appropriately identified and mitigated."

32.     Then, on February 29, 2024, TD held an earnings call to discuss its 1Q 24 financial results. During the call, Defendant Masrani spoke about TD's AML controls in his prepared remarks. He stated, in relevant part:

I know there are questions related to the bank's investment in our risk and control infrastructure including our AML program. We are making comprehensive enhancements. This is a priority for the bank, and we take our responsibility seriously to live up to our high standards. We will continue to mobilize the required resources to strengthen our capabilities. . .

We are accelerating our investments in our risk and control environment, hiring hundreds of colleagues in these areas across the enterprise over the past 2 quarters. In short, we know what the AML issue is, and we are making progress in fixing it every day.

33.    Also on the call, Bank of America analyst Ebrahim Huseini Poonwala asked, "the assumption is always TD is ahead of the curve in terms of management, risk control investments. What do you think happened there? And does that cause you to kind of reevaluate the rest of the bank, if there are other issues that could emerge?"  In response, Defendant Masrani stated, "[a]s far as our control infrastructure, we – this is an ongoing situation for TD or any big bank and the environment changes and as we hear improvements from others, including our regulators, what the industry is doing, we want to keep up with it and where appropriate, be ahead of it.  So it's an ongoing process."

34.    Later during the same call, BMO Capital Markets analyst Sohrab Movahedi stated, "I think you've made it clear that the AML issues are understood . . . and progress is being made fixing them," and then asked, "[a]re you in a better position now versus a few quarters ago to give a sense of how long do you think that will take.  And how much do you think it will cost?"  In response, Masrani stated "we know what the issues are.  We are working hard to improve and enhance our processes, and I'm confident that I've been with the bank many years that when we get on to [] particular issues we find, we get on to those and fix them."

35.    Next, on March 12, 2024, TD filed its 2024 investor proxy on Form 6-K with the SEC.  In the proxy statement, TD further touted its Audit Committee's efforts to ensure compliance with AML regulations.  Specifically, TD asserted that the Audit Committee, "[r]eceived updates

from the bank's chief anti-money laundering officer and key executives on the bank's enhancements to its U.S. Bank internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions" and "[o]versaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program), including the related risk assessment."

36.     Two weeks later, on March 26, 2024, Defendant Salom represented TD at National Bank's Annual Financial Services Conference.  During the conference, National Bank analyst Gabriel Dechaine raised TD's AML controls and the Company's vows to fix them, and asked, "I'm wondering what's the impact on your business as far as day-to-day operations and more compliance people running around that type of thing?"

In response, Salom stated, in part:

> This remediating our AML program is a top priority for the bank.  It's a top priority for me personally.  We are – we take any sort of breach in our governance and control processes very seriously.

> And so this is getting maximum attention inside the organization.  And we've made significant progress already on our program.  We've added significant talent and leadership to our AML organization. We've added hundreds of individuals, both in terms of analysts, investigators as well as supporting program management architects to be able to invest and enhance our program. We're investing in our data infrastructure.

> We're investing in technology, in other words, we know what we need to do, and we're at it. We're going to fix it. We believe it's manageable, but it is a top priority for the bank.

37.     Dechaine then specifically asked about the potential that TD's regulators would implement an asset cap on TD in the U.S.:

> [W]hen we look at regulatory oversight in the U.S. in the past, there have been examples where the regulator the OCC or the Fed says, okay, you guys have had some issues. We kind of cap your growth for a while and come up recently, actually. Is that even a worthy consideration for TD in the U.S.?

38.     In response, Salom downplayed the prospect of an asset cap, stating in relevant part: "I would expect us to make the requisite investments we need to make in our regulatory environment and certainly our governance and control environment.  But I would expect to still responsibly, sustainably grow our franchise in the U.S."

39.     The above statements identified in ¶¶25-29, 31-38 were materially false and/or misleading.  In truth, from January 2014 to October 2023, "pervasive" and "systemic deficiencies" plagued TD's AML controls.  Despite these "known" and "glaring deficiencies," TD "chose profits over compliance" and "failed to appropriately fund and staff its AML program, opting to postpone and cancel necessary AML projects" to keep its costs down as "senior executives at TD Bank enforced a budget mandate, referred to internally as a 'flat cost paradigm,' requiring that TD Bank's budget not increase year-over-year."  As a result, from January 2018 to April 2024, TD failed to adequately monitor the vast majority of its total transactions which allowed criminals to launder hundreds of millions of dollars using the Company's banking products and services.  Given this, TD was ultimately forced to pay more than $3 billion in fines and penalties to regulators and the OCC imposed an asset cap on the Company's U.S. business, stifling its growth.

**The Truth Is Revealed**

40.     On May 2, 2024, *The Wall Street Journal* reported that a DOJ investigation into TD's AML controls focused on "how Chinese crime groups and drug traffickers used the Canadian lender to launder money from U.S. fentanyl sales," and explained that "[t]he investigation was launched after agents uncovered an operation in New York and New Jersey that laundered hundreds of millions of dollars in proceeds from illicit narcotics through TD and other banks."  The article also revealed that on May 2, 2024, "a Canadian banking regulator fined TD the

equivalent of $6.7 million for failing to file suspicious activity reports and documents related to money laundering and terrorist activity, among other things."

41.     On this news, the price of TD stock declined $3.42 per share, or 5.9%, from $58.08 per share on May 2, 2024, to $54.66 per share on May 3, 2024.

42.     On May 3, 2024, TD published a press release in response to *The Wall Street Journal* and other media reports about its AML program.  In the press release, Defendant Masrani acknowledged problems with TD's AML program.  He stated: "Criminals relentlessly target financial institutions to launder money and TD has a responsibility and an obligation to thwart their illegal activity.  I regret that there were serious instances where the Bank's AML program fell short and did not effectively monitor, detect, report or respond.  This is unacceptable and not in line with our values."

43.     A month later, on June 6, 2024, Defendant Ahmed participated in a TD Cowen Financial Services Summit conference call on behalf of TD.  During the call, TD Cowen analyst Mario Mendonca asked about the impact of the pending DOJ investigation into TD's AML controls.  In response, Ahmed said, in part, "look, we are overhauling the program, cooperating with the regulators, bringing people to accountability that need to, but also that our program in some respects did not do its job."  Ahmed added that, despite the investigation, "we are growing this business and continue to expect to be able to grow it quite nicely within the swim lanes that we're already in.  And so I don't expect that it should really interfere with our ability to just continue to grow organically and with the market share gains that we've been able to capture."

44.     Next, on August 22, 2024, TD held its 3Q 24 earnings call.  During the call, National Bank analyst Gabriel Dechaine asked about the potential outcome of the investigation into TD's AML controls.  Specifically, he asked, "[i]s an asset cap on the table for the U.S.

business?"  In response, Defendant Masrani stated, in part, "I can't speculate.  We're in the middle of our negotiations.  We are making progress and it's not appropriate to speculate what the final deal would be. . . . There might be compliance requirements, it can be various other requirements. It's hard to speculate.  We are in the middle of these negotiations, investigations.  And so we just want to make sure that we give you a fulsome disclosure when it is appropriate rather than speculating what it may or may not be."

45.     Then, after the close of trading on October 9, 2024, *The Wall Street Journal* reported that TD was expected to plead guilty to charges that it failed to build proper AML systems and faced $3 billion in penalties as part of a settlement with U.S. regulators and prosecutors. *The Wall Street Journal* also reported that the OCC was expected to impose an asset cap barring TD from growing above a certain level in the U.S.

46.     The next day, October 10, 2024, TD published a press release announcing that it had "consented to orders with the Office of the Comptroller of the Currency (OCC), the Federal Reserve Board, and the Financial Crimes Enforcement Network (FinCEN) and entered into plea agreements with the Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section of the United States Attorney's Office for the District of New Jersey."

47.     The press release detailed the terms of the consent orders and plea agreements:

- A total payment of approximately US$3.09 billion, largely covered by previous provisions of US$3.05 billion.
- Requirements to remediate the Bank's U.S. AML program, broadly aligned to its existing remediation program, which is progressing steadily under the direction of its new U.S. AML leadership team.
- Requirement to prioritize the funding and staffing of the remediation, which is already in place.
- Formal oversight of the AML remediation through a Monitorship.
- The total assets of TD's two U.S. banking subsidiaries (TD Bank, NA and TD Bank USA, NA) ("US Bank") cannot exceed US$434 billion (total assets as at

September 30, 2024); the limitation does not apply to TD Securities, or any of the Bank's Canadian or other global businesses.

- The U.S. Bank is subject to more stringent approval processes for new bank products, services, markets, and stores to ensure the AML risk of new initiatives is appropriately considered and mitigated.

48.     The press release also quoted Defendant Masrani as stating:

We have taken full responsibility for the failures of our U.S. AML program and are making the investments, changes and enhancements required to deliver on our commitments. This is a difficult chapter in our Bank's history. These failures took place on my watch as CEO and I apologize to all our stakeholders.

49.     Also on October 10, 2024, DOJ published a press release to announce TD's guilty pleas to Bank Secrecy Act and money laundering conspiracy violations.  In DOJ's press release, Attorney General Merrick B. Garland stated: "By making its services convenient for criminals, TD Bank became one.  Today, TD Bank also became the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures, and the first US bank in history to plead guilty to conspiracy to commit money laundering.  TD Bank chose profits over compliance with the law – a decision that is now costing the bank billions of dollars in penalties."  DOJ's press release also quoted Deputy Attorney General Lisa Monaco as stating, "[f]or years, TD Bank starved its compliance program of the resources needed to obey the law."

50.     Further, DOJ revealed significant additional details that demonstrate the breadth and depth of the Company's malfeasance.  For example, DOJ stated that, "between January and October 2023, TD Bank had long-term, pervasive, and systemic deficiencies in its U.S. AML policies, procedures, and controls but failed to take appropriate remedial action."  According to DOJ, TD failed to remediate the AML deficiencies because, "senior executives at TD Bank enforced a budget mandate, referred to internally as a 'flat cost paradigm,' requiring that TD Bank's budget not increase year-over-year, despite its profits and risk profile increasing significantly over the same period."  As a result, "[a]lthough TD Bank maintained elements of an

AML program that appeared adequate on paper, fundamental, widespread flaws in its AML program made TD Bank an 'easy target' for perpetrators of financial crime."

51.    DOJ further explained that "[o]ver the last decade," TD's "federal regulators" and "own internal audit group repeatedly identified concerns about [TD's] transaction monitoring program, a key element of an appropriate AML program necessary to properly detect and report suspicious activities."  However, despite these repeated warnings, "from 2014 through 2022, TD Bank's transaction monitoring program remained effectively static, and did not adapt to address known, glaring deficiencies; emerging money laundering risks; or TD Bank's new products and services."  This was because TD "failed to appropriately fund and staff its AML program, opting to postpone and cancel necessary AML projects prioritizing a 'flat cost paradigm' and the 'customer experience.'"

52.    As a result, "[t]hroughout this time" TD "intentionally did not automatically monitor all domestic automated clearinghouse (ACH) transactions, most check activity, and numerous other transaction types, resulting in 92% of total transaction volume going unmonitored from Jan. 1, 2018, to April 12, 2024."  According to DOJ, "[t]his amounted to approximately $18.3 trillion of transaction activity."  Moreover, TD "also added no new transaction monitoring scenarios and made no material changes to existing transaction monitoring scenarios from at least 2014 through late 2022; implemented new products and services . . . without ensuring appropriate transaction monitoring coverage; failed to meaningfully monitor transactions involving high-risk countries; instructed [bank branches] to stop filing internal unusual transaction reports on certain suspicious customers; and permitted more than $5 billion in transactional activity to occur in accounts even after the bank decided to close them."

53.    The OCC also published a press release on October 10, 2024, to announce its consent order.  In the press release, Acting Comptroller of the Currency Michael J. Hsu stated, "TD Bank's persistent prioritization of growth over controls allowed its employees to break the law and facilitate the laundering of hundreds of millions of dollars.  The bank's blatant risk management failures attracted illicit actors and are egregious and unacceptable."

54.    The OCC further stated in its press release:

The OCC found that the bank had significant, systemic breakdowns in its transaction monitoring program. The bank processed hundreds of millions of dollars of transactions with clear indicia of highly suspicious activity, creating a potential for significant money laundering, terrorist financing, or other illicit financial transactions. The bank repeatedly failed to take appropriate and timely corrective action to address the highly suspicious activity and failed to properly emphasize BSA/AML compliance.

The bank had a systemic breakdown in its processes to identify and report suspicious activity, and a pattern or practice of noncompliance with the suspicious activity report filing requirement, resulting in numerous violations. The bank also violated currency transaction reporting requirements on numerous occasions.

55.    On this news, the price of TD stock declined $4.07 per share, or 6.4%, from $63.51 per share on October 9, 2024, to $59.44 per share on October 10, 2024.

## LOSS CAUSATION

56.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of TD securities and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 2, 2024, and October 10, 2024, as alleged herein, the price of TD securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of TD securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

57.     As alleged herein, Defendants acted with scienter because Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.  As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TD, their control over allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning TD, participated in the fraudulent scheme alleged herein.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TD securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of TD and their families and affiliates.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 31, 2024, there were more than 1.7 billion shares of TD common stock outstanding, traded on both the NYSE and the Toronto Stock Exchange and owned by at least thousands of investors.

60.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.   Whether Defendants violated the Exchange Act;

B.   Whether Defendants omitted and/or misrepresented material facts;

C.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.   Whether the price of TD's securities was artificially inflated;

F.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.   The extent of damage sustained by Class members and the appropriate measure of damages.

61.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

62.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

63.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

64.    TD's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue

from liability.  The statements alleged to be false and misleading above relate to then-existing facts and conditions.

65.    To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

66.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of TD who knew that the statement was false.

## PRESUMPTION OF RELIANCE

67.    At all relevant times, the market for TD's securities was an efficient market for the following reasons, among others:

A.  The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

B.  As a regulated issuer, TD filed periodic public reports with the SEC;

C.  TD regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.  TD was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.    As a result of the foregoing, the market for TD securities promptly digested current information regarding TD from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of TD securities during the Class Period suffered similar injury through their purchase of TD securities at artificially inflated prices and the presumption of reliance applies.

69.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

70.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase TD securities at artificially inflated prices.

72.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for TD securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about TD's business, as specified herein.

74.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's AML controls, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TD's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

78.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against The Individual Defendants**

79.    Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

80.    The Individual Defendants acted as controlling persons of TD within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about TD, the Individual Defendants had the power and ability to control the actions of TD and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

81.    **WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem

just and proper.

## JURY DEMAND

82.    Plaintiff demands a jury trial.

Dated: December 11, 2024                    Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

Javier Bleichmar
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com

-and-

    */s/ Ross Shikowitz*
Ross Shikowitz
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
rshikowitz@bfalaw.com

-and-

Adam McCall (*pro hac vice* forthcoming)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (212) 789-2303
Facsimile: (415) 445-4020
amccall@bfalaw.com

*Counsel for Plaintiff Pedro Gonzalez*

## CERTIFICATION

I, Pedro Gonzalez, hereby certify as follows:

1.    I have reviewed the Complaint against The Toronto-Dominion Bank ("TD Bank") and others alleging violations of the federal securities laws and have authorized its filing.

2.    I did not purchase or sell securities of TD Bank at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.    My transactions in the TD Bank securities that are the subject of the Complaint during the class period specified therein are reflected in Schedule A, attached hereto.

5.    I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.    Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: __12/10/2024__

DocuSigned by:

*Pedro Gonzalez* _____

D806844A016048F...

Pedro Gonzalez

**SCHEDULE A**
TRANSACTIONS IN
THE TORONTO DOMINION BANK

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/24/2022 | 2,000.00 | 80.61 | ($161,219.80) |
| Purchase | 03/24/2022 | 1,400.00 | 80.61 | ($112,854.00) |
| Purchase | 03/24/2022 | 100.00 | 80.55 | ($8,054.50) |
| Purchase | 03/24/2022 | 1,200.00 | 80.55 | ($96,660.00) |
| Purchase | 03/24/2022 | 1,200.00 | 80.56 | ($96,672.00) |
| Purchase | 03/24/2022 | 5,500.00 | 80.57 | ($443,107.50) |
| Purchase | 03/24/2022 | 1,500.00 | 80.57 | ($120,853.50) |
| Purchase | 11/09/2022 | 145.00 | 65.00 | ($9,425.00) |
| Purchase | 05/26/2023 | 75.00 | 57.51 | ($4,312.88) |
| Purchase | 11/16/2023 | 40.00 | 61.02 | ($2,440.80) |
| Sale | 06/06/2024 | -9,500.00 | 55.87 | $530,765.00 |
| Sale | 08/30/2024 | -2,000.00 | 59.55 | $119,100.00 |